IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| HWH Transport, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CRST Expedited, Inc. d/b/a CRST The Transport Solution, Inc., Universal Industrial Gases, LLC, and Nucor Steel Sales Corporation,<br><br>Defendants. | Case No.: 4:25-cv-13591-JD<br><br>**ORDER AND OPINION** |

Before the Court is Defendants Universal Industrial Gases, LLC ("UIG") and Nucor Steel Sales Corporation ("Nucor") (collectively, "Defendants") motion to dismiss. (DE 14.) Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) of the three causes of action that, by their headings, are asserted against them: tortious interference with HWH Transport, LLC's ("HWH") asserted carrier's lien, conversion, and intentional interference with contractual relations. (DE 1 ¶¶ 97–112; DE 14-1 at 6–13.) HWH filed a response in opposition (DE 18), and Defendants filed a reply (DE 23). For the reasons below, the Court grants the Motion in part and denies it in part.

## I. BACKGROUND

The following facts are drawn from the Complaint and the documents attached to it. At this stage, the Court accepts HWH's well-pleaded factual allegations as true and draws reasonable inferences in HWH's favor.

### A. Factual Background

UIG and Nucor contracted with Defendant CRST Expedited, Inc. d/b/a CRST The Transport Solution, Inc. ("CRST"), a transportation broker, to transport two steel storage tanks from Becker, Minnesota, to a facility in Darlington, South Carolina. (DE 1 ¶¶ 8–9.) HWH then contracted with CRST to perform the transportation. (*Id.* ¶¶ 10, 18.) Each tank measured about 143 feet long and weighed about 206,000 pounds, requiring specialized equipment and routing. (*Id.* ¶ 9.) HWH alleges that CRST agreed to pay $625,000 per tank, plus specified third-party charges, with "40% when loaded [and the] remainder at delivery." (*Id.* ¶¶ 10, 18, 21.)

HWH began transporting the tanks from Minnesota on June 26, 2025. (*Id.* ¶ 30.) According to the Complaint, route changes increased the anticipated trip from approximately 2,100 miles to 3,840 miles. (*Id.* ¶¶ 13–15, 49–50.) CRST paid HWH $500,000 on or about July 1, 2025. (*Id.* ¶ 48.)

When HWH's trucks were approximately fifteen miles from the Darlington destination, HWH stopped at a South Carolina weigh station "to allow CRST time to issue payment for the transport pursuant to the terms of the Transportation Contract." (*Id.* ¶ 52.) HWH alleges that CRST then "refused to issue the remaining payment" and told HWH that it would pay the balance "30-45 days after the tanks were delivered." (*Id.* ¶ 53.) UIG and/or Nucor representatives then inspected the tanks, initially discussed delivery, and later raised concerns about possible damage. (*Id.* ¶¶ 54–59.)

The tanks remained approximately fifteen miles from their destination for more than six weeks. HWH alleges that, during that period, UIG, Nucor, and CRST evaluated whether the tanks would be accepted while HWH awaited confirmation that CRST would pay the remaining balance. (*Id.* ¶ 61.)

On October 14, 2025, HWH alleges, CRST "clearly and unequivocally" communicated its refusal to pay the outstanding charges and its refusal to accept HWH's performance on the terms HWH contends governed the parties' agreement. (*Id.* ¶ 62.) HWH further alleges that CRST announced that same day its intent "to coordinate with Nucor Steel and UIG to obtain control of the tanks from HWH Transport without payment of charges[.]" (*Id.* ¶ 63.)

CRST's October 14 correspondence, which HWH attached to the Complaint, reflects a materially different characterization of the dispute. CRST asserted that payment was not yet due, that HWH lacked the operating authority necessary to finish the delivery, and that HWH's refusal to deliver was unjustified. (DE 1-5 at 1–2.) The letter also stated, however, that CRST, its client, and its customer were "prepared and have made arrangements to effectuate the transload of the tanks and final delivery" on October 16. (*Id.* at 1.)

HWH alleges that Nucor and UIG thereafter took the tanks over HWH's objection by removing them from HWH's trucks and transloading them onto trucks operated by another carrier. (DE 1 ¶ 64.) According to HWH, that conduct deprived it of possession of the tanks and its asserted ability to secure payment through a carrier's lien. (*Id.* ¶¶ 64–66.)

### B. Procedural Background

HWH filed this action on November 26, 2025. (DE 1.) CRST answered on February 9, 2026. (DE 12.) UIG and Nucor filed the present motion on February 11, 2026. (DE 14.) HWH responded on March 11, 2026 (DE 18), and Defendants replied on March 25, 2026 (DE 23).[1]

## II. LEGAL STANDARD

A motion to dismiss for failure to state a claim challenges the legal sufficiency of the challenged pleading. *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). While a complaint "does not need

[1] The Court raised subject-matter jurisdiction *sua sponte* and held DE 14 in abeyance because HWH's original Local Civil Rule 26.01 disclosure did not identify its members. (DE 27.) "For purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all of its members[.]" *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). HWH's amended disclosure identifies William Sterett III, William Sterett IV, Maxwell Sterett, and John Sterett as its members and states that each is a citizen of Kentucky. (DE 29 at 3.) Having reviewed the parties' jurisdictional disclosures, the Court is satisfied that complete diversity exists and that it has subject-matter jurisdiction under 28 U.S.C. § 1332.

[to allege] detailed factual allegations," pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Rule 8(a)(2), Fed. R. Civ. P.).

The Court may consider documents attached to the Complaint. Fed. R. Civ. P. 10(c). But attachment does not necessarily mean that a plaintiff has adopted as true every factual assertion contained in the document. The Fourth Circuit has instructed that "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016). And where a document is attached for a purpose other than establishing the truth of its contents, treating those contents as true may be improper, particularly when the document was prepared by the opposing party and contains its version of disputed events. *Id.* at 167–68.[2]

---

[2] That principle is relevant here. HWH attached CRST's October 14 letter principally as evidence of the parties' communications and the developing dispute. The Court may consider what the letter says and the fact that the statements were made, but it does not treat CRST's disputed assertions concerning the validity of HWH's contract, the timing of payment, HWH's operating authority, or the legal validity of HWH's asserted lien as established facts merely because the letter accompanies the Complaint.

## III. DISCUSSION

### A. Fifth Cause of Action - Tortious Interference with Asserted Carrier's Lien

The caption of HWH's Fifth Cause of Action identifies it as a claim "[a]gainst Nucor Steel and UIG for tortious interference" with HWH's asserted carrier's lien. (DE 1 at 15.) The allegations actually comprising the claim, however, identify CRST as the alleged wrongdoer. HWH alleges that "CRST knew or should have known" of HWH's lien rights, that "CRST intentionally interfered" with those rights by arranging with UIG and Nucor to obtain the tanks, and that "CRST's interference" impaired HWH's security. (*Id.* ¶¶ 99–101.)

Defendants accordingly argue that Count Five should be dismissed because, among other reasons, its operative allegations identify no tortious conduct by UIG or Nucor. (DE 14-1 at 9–10.) They also advance broader arguments that neither S.C. Code Ann. § 36-7-307 nor 49 U.S.C. § 80109 creates a cause of action for tortious interference with statutory lien rights and that HWH does not satisfy the prerequisites for a lien under either provision. (*Id.* at 6–9.)

HWH's response resolves the first question. HWH expressly represents that its Fifth Cause of Action "is alleged solely against CRST, not UIG and Nucor Steel." (DE 18 at 1 n.1.) The Court therefore construes HWH's pleading consistently with that unequivocal representation.

Because HWH disclaims Count Five against the moving Defendants, the Court need not decide on this Motion the broader question whether South Carolina would recognize a tort denominated "tortious interference with a statutory right to assert a

carrier's lien." Defendants correctly observe that a federal court sitting in diversity must be cautious before recognizing an expansion of state law. The Fourth Circuit has described the federal court's function as one "to ascertain and apply the law of [the State] as it exists" and "not [to] create or expand that State's public policy." *S. Power Co. v. Cleveland Cnty.*, 24 F.4th 258, 266 (4th Cir. 2022) (quoting *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995)). But because HWH expressly states that it does not assert Count Five against UIG or Nucor, resolving that unsettled question is unnecessary.

Nor does the Court presently determine whether HWH ultimately possessed a carrier's lien under S.C. Code Ann. § 36-7-307, 49 U.S.C. § 80109, the common law, or another source. Those questions may bear on the surviving claims, but the Court addresses them only to the extent necessary to determine whether HWH has pleaded those claims plausibly.

Accordingly, Defendants' Motion is GRANTED as to Count Five only to the extent the Complaint's heading purports to assert that cause of action against UIG or Nucor. Consistent with HWH's express representation, Count Five does not proceed against UIG or Nucor. The Court expresses no opinion about the viability of the claim HWH purports to assert against CRST.

**B. Sixth Cause of Action - Conversion**

HWH's Sixth Cause of Action alleges that it possessed a property and possessory interest in the tanks because of its asserted carrier's lien and that UIG

and Nucor wrongfully defeated that interest by taking the tanks from HWH's possession over its objection. (DE 1 ¶¶ 103–07.)

Defendants advance three related arguments. First, they contend HWH had no valid possessory interest because any lien under § 36-7-307 was lost when HWH unjustifiably refused to complete delivery even though HWH alleges that the remaining balance was due "at delivery." (DE 14-1 at 7, 10–11.) Second, they contend HWH does not qualify for a federal lien under 49 U.S.C. § 80109 because it was not acting as a common carrier. (*Id*. at 8–9.) Third, they maintain that Nucor, as owner or consignee of the tanks, had a legal right to possess them and therefore could not convert them. (*Id*. at 11-12; DE 23 at 3-4.) In reply, Defendants add that, to the extent HWH claims the lien itself was converted, an undocumented intangible lien is not property subject to conversion under South Carolina law. (DE 23 at 3–4.)

HWH responds that its carrier's lien supplied a possessory interest in the tanks. (DE 18 at 6.) HWH presses that its refusal to surrender possession was justified because CRST indicated it would not pay the amount HWH claims was due upon delivery. (*Id*. at 7.) It also contends that UIG and Nucor could not defeat that possessory interest by self-help merely because they claimed ownership of the underlying goods. (*Id*. at 9–10.) HWH also argues that it was acting as a common carrier because it offers transportation services to the public rather than exclusively to CRST, UIG, or Nucor. (*Id*. at 4–6.) The Court concludes that the *pleadings* do not permit dismissal of the conversion claim.

Under South Carolina law, conversion is an unauthorized exercise of dominion over another's personal property inconsistent with that person's rights. Critically, outright ownership is not the only interest sufficient to support the tort. The South Carolina Supreme Court has held that "it is essential that the plaintiff establish *either title to or right to the possession* of the personal property." *Crane v. Citicorp Nat'l Servs., Inc.*, 437 S.E.2d 50, 52 (S.C. 1993) (emphasis added). Likewise, *Hennes v. Shaw* reiterates that a conversion plaintiff may proceed by establishing "either title to or right to the possession" of the property. 725 S.E.2d 501, 508 (S.C. Ct. App. 2012).

Nucor's asserted ownership therefore does not, by itself, dispose of the conversion claim. Defendants' authorities establish that conversion does not arise when a defendant is exercising a legal right superior to the plaintiff's. *See Richardson's Rests., Inc. v. Nat'l Bank of S.C.*, 403 S.E.2d 669, 672 (S.C. Ct. App. 1991) ("[C]onversion cannot arise from the defendant's exercise of a legal right over property."); *Mackela v. Bentley*, 614 S.E.2d 648, 650 (S.C. Ct. App. 2005) ("A plaintiff's claim for conversion fails where the defendant proves a legal right to the property."); *Brannon v. Palmetto Bank*, 638 S.E.2d 105, 109 (S.C. Ct. App. 2006). But those authorities do not resolve the dispositive question at this stage: whether UIG's or Nucor's right to immediate possession was superior to HWH's alleged right to retain possession when the tanks were removed.

Defendants' alternative reliance on *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 684 S.E.2d 756, 763 (S.C. 2009), does not require dismissal. *Gignilliat* held that conversion of an intangible right generally is limited to rights "identified with

some document." *Id.* at 763. HWH, however, does not plead that UIG and Nucor converted an abstract lien. It alleges that the asserted lien gave HWH a right to possess the tangible tanks and that Defendants converted the tanks by removing them from HWH's possession over its objection. (DE 1 ¶¶ 103–07; DE 18 at 8–9.) Whether HWH actually possessed such a right is a separate question; *Gignilliat* does not answer it.

Nor is this a case in which the alleged tort consists merely of damaging or interfering with another's property without assuming dominion over it. *Cf. Jenkins v. Few*, 705 S.E.2d 457, 461–62 (S.C. Ct. App. 2010) (finding sabotage insufficient for conversion where defendant did not assume and exercise a right of ownership over the truck). Here, HWH alleges actual dispossession: UIG and Nucor allegedly removed the tanks from HWH's trailers over HWH's objection and transferred them to another carrier. (DE 1 ¶ 64.)

The pleadings and incorporated materials do not resolve whether HWH had a legally protected right to retain the tanks in Defendants' favor. Moreover, Section 36-7-307 provides that a carrier "has a lien on the goods covered by a bill of lading" for specified transportation charges and expenses. S.C. Code Ann. § 36-7-307(a). The statute further provides that "[a] carrier loses its lien on any goods that it voluntarily delivers or unjustifiably refuses to deliver." *Id.* § 36-7-307(c). Thus, HWH's state-law theory ultimately depends on facts bearing on the existence of a qualifying bill of lading and whether HWH's refusal to complete delivery was unjustifiable.

The federal theory is narrower. Section 80109 applies to "[a] common carrier issuing a negotiable bill of lading." 49 U.S.C. § 80109. Defendants emphasize the specialized, individually negotiated nature of this shipment in arguing that HWH was not acting as a common carrier. (DE 14-1 at 8–9.) HWH relies principally on *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018), and alleges that its services are available to the public. (DE 18 at 4–6.) *Air Evac* explains that common-carrier status "is not changed by the fact that the carrier is rendering a specialized service," but contrasts a common carrier with one that makes "individualized decisions, in particular cases, whether and on what terms to deal." 910 F.3d at 764 (citations omitted). The Court need not resolve HWH's status at this stage. Even if HWH were a common carrier, § 80109 also requires a negotiable bill of lading, and the present pleadings do not establish all of those predicates. That limits what may be inferred from § 80109 now, but it does not establish that HWH lacked any legally cognizable right to possession under every potentially applicable source of law.

The parties focus on § 36-7-307 and § 80109, but South Carolina law also contains S.C. Code Ann. § 58-13-410. That statute provides that "[a]ll persons hauling, moving, transporting or carrying goods or chattels" from outside South Carolina into this State, "shall have a lien" for agreed or reasonable carrying charges, and states that the lien continues for ten days after delivery. *Id*. The parties did not brief § 58-13-410. The Court therefore does not rely on it to establish that HWH had an immediate possessory right, and does not decide its application, priority, enforcement mechanism, or any preemption question. The provision nonetheless

reinforces the Court's conclusion that the existence and scope of HWH's asserted lien rights should not be finally adjudicated on this Rule 12(b)(6) record.

Nor can the Court resolve as a matter of law Defendants' contention that HWH lost any possessory lien by an "unjustifiable refusal to deliver." (DE 14-1 at 4; DE 1-5.) HWH alleges that the Transportation Contract required the remaining balance to be paid "at delivery." (DE 1 ¶¶ 18, 21.) Defendants rely on that term and argue that HWH had no right to stop fifteen miles short and demand payment first. (DE 14-1 at 7, 10–11.) HWH, however, also alleges that CRST told it the balance would not be paid until "30-45 days after the tanks were delivered" (DE 1 ¶ 53), that HWH sought assurance of payment at delivery (*id.* ¶¶ 60–61), and that CRST later communicated what HWH characterizes as an unequivocal refusal to pay the outstanding charges (*id.* ¶ 62). Those allegations create a factual dispute about the circumstances surrounding HWH's continued detention of the tanks that cannot be resolved against HWH at this stage.

Defendants also rely on CRST's October 14 letter, which states that payment was not yet due, that HWH lacked the operating authority necessary to complete delivery, and that HWH's refusal to deliver barred its lien. (DE 1-5 at 1–2; DE 14-1 at 3–4, 7.) Those assertions may ultimately prove correct. But CRST authored the letter during the dispute, and HWH attached it as evidence of the parties' communications, not as an admission that CRST's disputed factual and legal assertions were true. Under *Goines*, the Court does not treat those contested

assertions as established merely because the letter is attached to the Complaint. 822 F.3d at 167–68.

Nor does the Court adopt HWH's broader contention that it was necessarily "required to maintain possession" because every available lien would be lost upon delivery. (DE 18 at 3, 7–8.) Section 36-7-307(c) makes possession material to the Article 7 lien, but § 58-13-410 provides that the lien created by that statute continues for ten days after delivery. The Court therefore decides neither that HWH had to retain possession to preserve every possible lien nor that its refusal to deliver was justified. Those questions depend on the governing source of law and facts concerning the parties' agreements, communications, obligations, and the circumstances of the stopped delivery.

For Rule 12(b)(6) purposes, HWH alleges that it transported the tanks from Minnesota into South Carolina for agreed charges, remained in physical possession of them, asserted a right to retain possession to secure payment, objected to their removal, and nevertheless was dispossessed by UIG and Nucor. (DE 1 ¶¶ 8–10, 52–64, 103–07.) Taking those allegations as true, Defendants have not established from the face of the Complaint and its exhibits that HWH lacked any legally cognizable right to immediate possession when the tanks were removed. The conversion claim therefore survives.

Accordingly, Defendants' motion to dismiss HWH's Sixth Cause of Action for conversion is **DENIED**.

### C. Seventh Cause of Action - Intentional Interference with Contractual Relations

HWH's Seventh Cause of Action alleges that it had a valid transportation contract with CRST. HWH contends that UIG and Nucor knew of that contract and intentionally interfered with the contractual relationship by coordinating the removal and transloading of the tanks, thereby preventing HWH from completing performance and receiving payment from CRST. (DE 1 ¶¶ 108–12.)

South Carolina recognizes five elements of intentional interference with contractual relations: "(1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." *Camp v. Springs Mortgage Corp.*, 426 S.E.2d 304, 305 (S.C. 1993).

Defendants principally contend that HWH cannot plausibly allege absence of justification because the tanks were destined for their facility and their conduct was an exercise of legitimate ownership and business interests after HWH refused to deliver. (DE 14-1 at 12–13.) HWH responds that, even if Defendants had a legitimate interest in obtaining the tanks, the means allegedly used were improper: according to HWH, Defendants knew HWH claimed a possessory lien yet coordinated with CRST to remove the tanks over HWH's objection without first resolving that asserted interest. (DE 18 at 9–10.)

Defendants are correct that their commercial interest in obtaining the tanks is relevant. Under South Carolina law, "[a] party is justified . . . when acting in the

advancement of its legitimate business interests or legal rights." *BCD LLC v. BMW Mfg. Co.*, 360 F. App'x 428, 435 (4th Cir. 2010) (applying South Carolina law). And *Webb v. Elrod* explains that "[t]he exercise in good faith of a legal right" ordinarily does not support an intentional-interference claim even when the exercise of that right causes a third party not to perform a separate contract. 418 S.E.2d 559, 561 (S.C. Ct. App. 1992).

Those principles do not conclusively resolve the claim on the pleadings. *BCD* also explains that absence of justification may be shown by conduct carried out "for an improper purpose, such as malice or spite, or through improper means, such as violence or intimidation." 360 F. App'x at 435. Defendants' justification theory depends in substantial part on their premise that their right to immediate possession was superior to HWH's. If HWH had no right to retain the tanks, Defendants' justification argument may ultimately prevail. If HWH held an enforceable superior possessory interest, however, knowingly defeating that interest by self-help could support a finding of improper means. The Court cannot choose between those competing premises on this record.

The Complaint alleges that UIG and Nucor knew about the transportation arrangement. (DE 1 ¶¶ 54–64.) It also alleges that they participated in discussions concerning delivery and payment, coordinated with CRST concerning possession of the tanks, and ultimately removed the tanks from HWH's trailers over HWH's objection. (*Id.* ¶¶ 54–64, 108–12.) With the parties' competing rights to immediate

possession unresolved, those allegations are sufficient at this stage to plead absence of justification.

Defendants raise a separate procurement argument in reply. They contend HWH's own pleading alleges that CRST had breached or anticipatorily repudiated the Transportation Contract before UIG and Nucor physically transloaded the tanks. Thus, Defendants argue, "there was no breach left for Nucor to procure." (DE 23 at 5.) They rely on out-of-state decisions that conduct occurring after an independently completed breach cannot have caused that breach. *Id.* at 5–6 (citing *UMB Bank N.A. v. Asbury Cmtys., Inc.*, No. 20-160, 2021 WL 4712634, at *5 (N.D. Okla. Oct. 8, 2021); *Berman v. Davidson Media Va. Stations, LLC,* No. 15-299, 2016 WL 775784, at *3 (E.D. Va. Feb. 26, 2016)).

That argument identifies a genuine tension in HWH's pleading. Count Four alleges that CRST anticipatorily repudiated the Transportation Contract before HWH completed performance. (DE 1 ¶¶ 92–96.) Count Seven, meanwhile, alleges that UIG and Nucor procured CRST's breach through the transload and related coordination. (*Id.* ¶¶ 108–12.) In any event, dismissal is not warranted on the present pleadings.

Defendants did not develop this independent procurement-and-chronology ground in their opening memorandum; it appears in their reply. Compare DE 14-1 at 12–13, with DE 23 at 5–6. In any event, the Complaint does not establish that UIG and Nucor became involved only after an independently completed breach.

Paragraph 63 alleges that, on the same date as the alleged repudiation, CRST announced its intent "to coordinate with Nucor Steel and UIG to obtain control of the tanks." (DE 1 ¶ 63.) CRST's attached October 14 letter likewise states that CRST, its client, and its customer already were "*prepared and have made arrangements* to effectuate the transload of the tanks and final delivery." (DE 1-5 at 1 (emphasis added).) Because Count Seven incorporates the preceding allegations (DE 1 ¶ 108), the pleading permits a reasonable inference that coordination involving UIG and Nucor preceded or accompanied the alleged repudiation rather than beginning only after a completed breach.

The cases cited in reply therefore do not compel dismissal. They stand for the unremarkable proposition that an act occurring only after an independently completed breach cannot retrospectively cause that breach. The allegations here permit an inference of third-party coordination before or contemporaneous with the conduct HWH characterizes as CRST's repudiation. Whether the evidence ultimately supports that inference is a question for a developed record.

The Court therefore concludes that HWH has pleaded sufficient facts to proceed on Count Seven. This ruling does not determine that UIG or Nucor acted without justification, that either Defendant actually procured CRST's breach, or that HWH will ultimately be able to prove those elements. Accordingly, Defendants' motion to dismiss HWH's Seventh Cause of Action is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Defendants Universal Industrial Gases, LLC and Nucor Steel Sales Corporation's Motion to Dismiss (DE 14) is **GRANTED IN PART and DENIED IN PART**.

The Motion is **GRANTED** as to HWH's Fifth Cause of Action only to the extent its heading purports to assert that claim against UIG or Nucor. Consistent with HWH's express representation that Count Five "is alleged solely against CRST, not UIG and Nucor Steel" (DE 18 at 1 n.1), Count Five does not proceed against UIG or Nucor. The Court expresses no opinion concerning the viability of that cause of action against CRST.

The Motion is **DENIED** as to HWH's Sixth Cause of Action for conversion and Seventh Cause of Action for intentional interference with contractual relations.

For clarity, the Court does not decide at this pleading stage the validity or priority of any asserted carrier's lien, the justification for HWH's refusal to complete delivery, or the parties' ultimate rights to immediate possession. Those issues remain for a developed record.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
August 19, 2026